UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHIFT4 PAYMENTS, LLC, | : |
|     Plaintiff, | : |
| | : |
| v. | :   No. 5:19-cv-00330 |
| | : |
| ERIC SMITH; | : |
| ALLIANCE CONSULTANT GROUP, INC., | : |
| *d/b/a ALLIANCE BUNDLES*; | : |
| JOHN DOES 1-10; | : |
| ABC COMPANIES 1-10, | : |
|     Defendants | : |

**O P I N I O N**
Defendant Smith's Motion to Dismiss, ECF No. 6 – Denied
Defendants Smith and Alliance's Motion to Dismiss, ECF No. 14 – Granted

**Joseph F. Leeson, Jr.**                                                                                                                                                              July 17, 2019
**United States District Judge**

## I.    INTRODUCTION

Plaintiff Shift4 Payments, LLC ("Shift4") brings this action pursuant to 15 U.S.C. § 1051 *et seq*. ("Lanham Act") and the statutory and common laws of the Commonwealth of Pennsylvania. Shift4 alleges that Defendant Alliance Consultant Group ("Alliance"), through its Chief Executive Officer Defendant Eric Smith, posted false and duplicative advertisements on the same websites as Shift4, harassed sales representatives with disruptive "robo-calls," and published defamatory and disparaging false statements about Shift4 and its business practices.

Smith has moved to dismiss the Complaint, as it relates to him, for lack of personal jurisdiction. Also, Smith and Alliance have jointly moved to compel arbitration on all claims. For the reasons set forth below, Smith's motion to dismiss for lack of personal jurisdiction is denied, but Defendants' motion to compel arbitration is granted.

## II. BACKGROUND

The Complaint alleges the following facts. Shift4, which was formerly known as Harbortouch Payments, is a limited liability company organized and existing under the laws of the State of Delaware and has a principal place of business in Allentown, Pennsylvania. *See* Compl. ¶ 5, ECF No. 1. Alliance, which at all times was and still is operated by Smith, is a business entity organized and existing under the laws of the State of Florida and has a principal place of business in Kissimmee, Florida. *See id.* at ¶ 6.

Shift4 and Alliance entered into a contract in October 2015 for Alliance to become an independent sales office ("ISO") of Shift4. *See* Compl. ¶¶ 29, 61, 76. Smith signed this ISO Agreement on behalf of Alliance. *See* Agreement 11, Defs.' Mot. Dismiss, Ex. A, ECF No. 14. The ISO Agreement was due for renewal in October 2017, but a lack of active merchant accounts caused it to be automatically terminated effective October 17, 2017. *See* Compl. ¶ 60.

During and after the contract term, Smith unlawfully duplicated Shift4 advertisements on various websites. Specifically, in or about April 2016, David Iava, the owner of a Shift4 ISO, noticed that within hours of posting an advertisement to certain websites, a seemingly duplicate advertisement would appear above his original advertisement. *See id*. at ¶ 33. While the text of the duplicate advertisement was nearly identical, the phone number in the duplicate advertisement was slightly different than his company's. *See id*. at ¶ 34. Iava called the phone number in the duplicate advertisement and spoke to Smith, who admitted that he was responsible for the duplicate advertisements. *See id*. at ¶ 35. Over the course of that initial phone call and two subsequent phone calls, Smith made defamatory comments about Shift4's chief executive officer. *See id*. at ¶ 36. Shortly after Iava's last communication with Smith, his company began receiving harassing robo-calls that caused the phone to ring approximately every 30 seconds,

with nothing but static on the other end of the line. *See id*. at ¶ 39. Smith's duplicative advertisements also continued. In or about April 2017, Iava obtained a copyright registration for one of his Shift4 advertisements prior to posting it. *See id*. at 45. Nevertheless, that advertisement was also duplicated by Smith to redirect users to Alliance. *See id*.

Defendants engaged in similar conduct in relation to another Shift4 ISO, Harbortouch Screen. *See id*. at ¶¶ 49-60. In or about November 2018, Iava discovered a website with the domain name "Harbortouch.sucks," which would redirect to "Harbortouch.pk." *See id*. at ¶ 75. Public domain name registration information revealed that Harbortouch.sucks was created in or about November 2017, shortly after Shift4's termination of its ISO agreement with Alliance. *See id*. at ¶ 76. The Harbortouch.pk website posted a number of false and defamatory statements relating to Shift4, their agents, their ISOs, and their business practices. *See id*. at ¶¶ 78-83.

Beginning in or about October 2018, Smith, for the benefit of Alliance, began using "ghost" robo-calls that caused ISO's to believe they were receiving calls from Shift4, but with only static on the other end of the line. *See id*. at ¶ 71. This caused ISO's to contact Shift4 to complain about the disruptive calls, thus interfering with Shift4's own operations. *See id*. at ¶ 72.

The Complaint asserts thirteen counts: (1) a claim pursuant to the Lanham Act for federal trademark and service mark infringement; (2) a claim pursuant to § 43(a) of the Lanham Act for unfair competition; (3) a claim pursuant to § 43(a) of the Lanham Act for false advertising; (4) a claim pursuant to 15 U.S.C. § 1125(d) ("Anticybersquatting Consumer Protection Act"); (5) a claim pursuant to Pennsylvania common law for trademark infringement; (6) a claim pursuant to Pennsylvania common law for product disparagement/trade libel; (7) a claim pursuant to Pennsylvania common law for defamation; (8) a claim pursuant to Pennsylvania common law for tortious interference with contract; (9) a claim pursuant to Pennsylvania common law for tortious

interference with prospective business relationships; (10) a claim pursuant to 73 P.S. § 201-9.2 for unfair competition; (11) a claim pursuant to Pennsylvania common law for injurious falsehood; (12) a claim pursuant to Pennsylvania common law for unjust enrichment; and (13) a claim for injunctive relief.

## III. STANDARDS OF REVIEW

### A. Personal Jurisdiction - Rule 12(b)(2)

When reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), this Court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff. *Pinker v. Rocher Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). However, once a defendant has raised a jurisdictional defense, the plaintiff must "prove by affidavits or other competent evidence that jurisdiction is proper." *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). If an evidentiary hearing is not held, a plaintiff "need only establish a prima facie case of personal jurisdiction." *Id*. A plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Provident Nat. Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434 (3d. Cir 1987).

### B. Motion to Compel Arbitration

In deciding a motion to compel arbitration, a district may either employ the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or the motion for summary judgment standard under Federal Rule of Civil Procedure 56. *MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 732 (E.D. Pa. 2013). When it is apparent from the face of a complaint and documents relied upon in the complaint that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under Rule

12(b)(6). *Id*. (quoting *Guidotti v. Legal Helpers Debt Resolution L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013)). If a court decides to hold discovery on the topic of arbitrability then, "after limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgement standard." *See Guidotti*, 716 F.3d at 776.[1]

### C.   Motion to Dismiss – Rule 12(b)(6)

In rendering a decision on a motion to dismiss under Rule 12(b)(6), this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker*, 292 F.3d at 374 n.7) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon

---

[1] The question in this case is whether Shift4's claims fall within the scope of the agreement to arbitrate, which is contained in the ISO Agreement referenced in the Complaint. *See* Compl. ¶¶ 29, 61, 76. The parties do not dispute the validity of the agreement, *see Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009) (holding that "[f]or a court to compel arbitration, it initially must find that there is a valid agreement to arbitrate"), or that the motion to compel arbitration is governed by the Rule 12(b)(6) standard, *see* Defs.' Mem. Sup. Mot. Dismiss 6, ECF No. 14-1; Pl.'s Opp. Defs.' Mot. Dismiss 10, ECF No. 19.

which relief can be granted. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**IV.     ANALYSIS**

Before determining whether arbitration should be compelled, the Court first considers whether it has personal jurisdiction over Smith. *See Control Screening LLC v. Tech. Application & Prod. Co.*, 687 F.3d 163, 171 (3d Cir. 2012) (affirming the district court's finding of personal jurisdiction then turning to the district court's decision to compel arbitration and affirming). Courts may evaluate personal jurisdiction under two tests: (1) the traditional minimum contacts test,[2] and (2) the *Calder*[3] effects test. Both tests are discussed herein.[4]

> **A.     Shift4 has alleged sufficient minimum contacts by Smith to subject him to personal jurisdiction in this Court.**

The Third Circuit Court of Appeals applies a three-step test in determining whether specific jurisdiction exists. *See O'Connor*, 496 F.3d at 317. The test is as follows: (1) the defendant must have "'purposefully directed [its] activities' at the forum.," *id.* (quoting *Burger King Corp.*, 471 U.S. at 472); (2) "the litigation must 'arise out of or relate to' at least one if those activities," *id.* (quoting *Helicopteros Nacionales de Colombia S.A.*, 466 U.S. at 414); and (3) "if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with 'fair play and substantial justice,'" *id.* (quoting *Burger King*, 471 U.S. at 476).

---

[2]     *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) and *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408 (1984)).
[3]     *Calder v. Jones*, 465 U.S. 783 (1984).
[4]     *But see Gov't Emples. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 163-64 (E.D. Pa. 2017) ("The Calder 'effects' test need only be considered if the court finds that a defendant lacks sufficient minimum contacts under the traditional test.").

### 1. Smith "purposefully directed" his activities at Pennsylvania.

This Court must first determine whether Smith directed his activities at Pennsylvania. Although "[p]hysical entrance is not required" for a defendant to purposely avail itself of the privilege of conducting activities within the forum, "what is necessary is a deliberate targeting of the forum." *See O'Connor*, 496 F.3d at 317.

In a declaration by Shift4's Senior Vice President of Service and Support, Douglas Demko states that "[o]n several occasions in 2017 and 2018, Smith directed auto-dialed robo-telephone calls at approximately 30-second intervals to Shift4's headquarters in Allentown, Pennsylvania that disrupted customer service and corporate operations." Demko Dec. ¶ 2, ECF No. 15-3. Owners of two non-Pennsylvania-based Shift4 ISO's received similar robo-calls and were advised by Smith's business partner, Joshua Tarter, that Smith was responsible for the robo-calls. *See* Iava Dec. ¶¶ 1, 6-7, ECF No. 15-4; Thakrar Dec. ¶¶ 1, 5-17, ECF No. 15-5.

Smith was also responsible for advertisements targeting Pennsylvania consumers. *See* Compl. ¶ 35. David Iava, the owner and president of Pair Payments ("Plymouth"), an ISO of Shift4 that markets and sells Shift4's Harbortouch-brand payment processing services and products, attested that within hours of posting Shift4 advertisements on certain webpages, a duplicative advertisement would appear on the same webpage but with slightly different information. *See* Iava Dec. ¶ 3. Iava declared that when he called the telephone number listed in the duplicate advertisement, he spoke to Smith, who admitted that he was responsible for posting the duplicate advertisements. *See id.* at ¶ 4. After this conversation, Plymouth continued to advertise on certain web pages for cities across the eastern United States, including pages serving Allentown, Pennsylvania, and Smith continued to post duplicative advertisements. *See id.* at ¶ 5. Additionally, Smith is responsible for a defamatory website entitled "Harbortouch.sucks," which

was advertised on Pennsylvania-area webpages, including Lancaster, Pennsylvania. *See* Compl. ¶¶ 75-85; Thakrar Dec. ¶¶ 22-23; Salimbene Dec. ¶ 3, ECF No. 15-1.

Smith, the Chief Executive Officer of Alliance, *see* Compl. ¶ 7, performed these activities on behalf of Alliance, as evidenced by his business offers to the owners of Shift4 ISO's to leave Shift4 and become an ISO for Alliance. *See* Iava Dec. ¶¶ 6-8; Thakrar Dec. ¶ 1, 5-17.[5]

The Court finds that Smith's multiple intentional acts directed at businesses and consumers in the Commonwealth establish that he "purposefully directed" his activities at Pennsylvania.

> **2. The litigation relates to at least one of Smith's activities in the forum such that litigation herein was reasonably foreseeable.**

If a court determines that the defendant has purposefully directed his conduct at the forum state, it must next determine if the present litigation arises out of at least one of those activities. *See O'Connor*, 496 F.3d at 317. In determining whether a claim arises out of specific contacts, courts may begin by analyzing whether "the plaintiff's claim would not have arisen in the absence of the defendant's contacts." *See id.* at 319, 322. However, the main question is whether the out-of-state resident has exercised the privilege of conducting activities in the forum state that would make litigation in that forum reasonably foreseeable. *See id.* at 322 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). The jurisdictional analysis ultimately

---

[5] Although individuals performing acts in a state in their corporate capacity are generally not subject to the personal jurisdiction of the courts of that state for those acts, "a recognized exception to this general rule is that a corporate agent may be held personally liable for torts committed in their corporate capacity." *See Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F. Supp. 669, 676 (E.D. Pa. 1997) (internal quotations omitted). "Courts have held that in order to hold such a defendant subject to personal jurisdiction, it must be shown that the defendant had a major role in the corporate structure, the quality of his contacts with the state were significant, and his participation in the tortious conduct alleged was extensive." *TJS Brokerage & Co. v. Mahoney*, 940 F. Supp. 784, 789 (E.D. Pa. 1996).

8
071619

hinges on whether the defendant "exercised the privilege of conducting activities within the state" and therefore "enjoyed the benefits and protection of the state's laws." *See O'Connor*, 496 F.3d at 322 (quoting *Int'l Shoe*, 326 U.S. at 319).

Although not all of Smith's activities occurred in Pennsylvania and therefore do not aid in the jurisdictional inquiry, at least some of his activities in Pennsylvania do "relate to" the instant litigation. Specifically, Counts I through III of the Complaint, which are brought pursuant to the Lanham Act for trademark and service mark infringement, unfair competition, and false advertising, *see* Compl. ¶¶ 90, 95, 100, relate to Smith's alleged duplicate advertisements placed on webpages specific to cities in the Eastern District of Pennsylvania. Count V, asserting a trademark infringement claim under Pennsylvania common law, also arises out of the aforementioned activities. *See id*. at ¶ 125. Counts VI and VII, brought for trade libel and defamation respectively, arise out of the "Harbortouch.sucks" website which Smith advertised on various Pennsylvania specific webpages, including Lancaster, Pennsylvania. *See id*. at 131, 136; Thakrar Dec. ¶¶ 22-23; Salimbene Dec. ¶ 3. Finally, Count XII, for unjust enrichment, arises from the robo-calls Smith directed towards a business which he knew to be headquartered in Allentown. *See* Compl. ¶ 171. Smith therefore has sufficient minimum contacts with this district to make jurisdiction reasonable.

    **3.**    **Litigation in the Eastern District of Pennsylvania comports with notions of fair play and substantial justice.**

Once a court has determined that the first two steps of the traditional test are satisfied, it must determine whether exercising jurisdiction would be reasonable. *See O'Connor*, 496 F.3d at 322. The Supreme Court has identified seven factors to aid in this determination: (1) the extent of the defendant's purposeful interjection into the forum state; (2) the burden on the defendant in defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's

state; (4) the forum's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Burger King*, 471 US at 477. To overcome a presumption of reasonableness, defendants must present a "compelling case" that litigating in the forum state would be unreasonable. *See O'Connor*, 496 F.3d at 325 (quoting *Burger King*, 471 U.S. at 477).

Smith contends that the first factor, the extent of his interjection into the forum state is "nonexistent." *See* Def. Smith's Mem. Supp. Mot. Dismiss 8, ECF No. 6-1. However, the aforementioned activities indicate that this assertion is not accurate. Not only did Smith direct false advertisements at consumers in Pennsylvania, he also intentionally caused disruption to an Allentown-based business and attempted to take business away from it by his wrongful conduct.

Next, Smith contends that the burden on him to litigate in Pennsylvania is substantial because he resides in Florida, which is a 24-hour drive from Pennsylvania. *See id.* at 9. But, the fact that Smith resides in another state is not dispositive. *See Reassure Am. Life Ins. Co. v. Midwest Res., Ltd.,* 721 F. Supp. 2d 346, 356-357 (E.D. Pa. 2010). Moreover, as will be discussed below, Smith agreed in the ISO Agreement that all disputes would be resolved in Lehigh County, Pennsylvania, which calls into question his assertion that the burden on him to litigate in this forum is "substantial." Smith also agreed to a choice-of-law provision in the ISO Agreement, eliminating any suggestion that it would be an added burden to force Smith to litigate in an unfamiliar legal forum or with unfamiliar state laws. The burden on Smith to litigate in the instant forum is therefore not substantial.

Smith contends that the third factor – the extent of the conflict with the sovereignty of the defendant's state - and the fourth factor – Pennsylvania's interest in the dispute – both weigh in

his favor. *See* Def. Smith's Mem. Supp. Mot. Dismiss 9. The gist of Smith's argument is that Florida has a strong interest in "ensuring its citizens are not unfairly dragged into another state when the claims arise," and that Pennsylvania "has practically nothing to do with the claims at issue." *See id*. Smith's argument is unpersuasive as Shift4 is headquartered in Allentown. *See* Compl. ¶ 5. Surely if Florida has a distinct interest in preventing its citizens from litigating in other states, then Pennsylvania has the same interest in protecting businesses which have their principal place of business in the state. Additionally, it appears that Smith's activities, even those taken outside of Pennsylvania, were performed with the intent of taking business away from the Allentown-headquartered business, which strengthens Pennsylvania's interest in the dispute.

Smith argues that the fifth and sixth factors – the most efficient judicial resolution and the importance of the forum to plaintiff's interest in convenient and effective relief – weigh in his favor because the "plurality of defendants to this suit are citizens of Florida" and "most of the evidence and witnesses are in Florida." *See* Def. Smith's Mem. Supp. Mot. Dismiss 9. Despite this claim, it does not appear that any of the three individuals from whom Shift4 has procured declarations reside in Florida: Iava is in Massachusetts; Thakrar resides in California; and Demko works for Shift4 in Allentown, Pennsylvania. Further, much of the evidence appears to be online and is able to be produced in multiple forums. *See Holder v. Suarez*, No. 3:CV-14-1789, 2015 U.S. Dist. LEXIS 38810, at *9 (M.D. Pa. Mar. 25, 2015) (determining, in a venue analysis, that where the evidence can be produced in multiple forums, the location of the evidence is generally irrelevant). While the fifth factor therefore appears neutral, the sixth factor weighs in favor of Shift4 because as a Pennsylvania-headquartered business, the instant forum is not only convenient to Shift4 but enforcement of any injunctive relief would be more effective.

071619

Finally, Smith's contention that an alternative forum, Florida, exists is unpersuasive when the other *Burger King* factors are considered. Although Florida would almost certainly have personal jurisdiction over Smith, this does not mean that the suit must be brought there. Forcing Shift4, the aggrieved party, to litigate its claims in Florida despite Smith's intentional contacts with Pennsylvania and the parties' agreement to settle their dispute in Lehigh County, Pennsylvania would be inequitable.

For the aforementioned reasons, Smith has not provided a "compelling" case as to why jurisdiction would be unreasonable in Pennsylvania. Applying the traditional test, this Court has personal jurisdiction over Smith.

### B. This Court may exercise personal jurisdiction over Smith pursuant to the *Calder* effects test.

Assuming arguendo that the traditional personal jurisdiction test fails, courts may apply the *Calder* effects test when intentional torts are involved. *See Miller Yacht Sales*, 384 F.3d at 108. Under the effects test, the court may exercise jurisdiction over a nonresident defendant when: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *See Marten v. Goodwin*, 499 F. 3d 290, 297 (3d Cir. 2007).

#### 1. Smith committed intentional torts.

The *Calder* test is only applicable where the defendant committed an intentional tort. *See Marten*, 499 F.3d at 297. As previously stated, Shift4 has alleged that Smith committed multiple intentional torts including defamation, trade libel, and tortious interference with contract and prospective business relationships.

### 2. Shift4 felt the brunt of the harm in Pennsylvania.

Once it has been established that an intentional tort has been alleged, courts must then determine whether the plaintiff felt the brunt of the harm in the forum state. *See Marten*, 499 F.3d at 297. This can be shown where, for example, "defendants knew of plaintiff's location and directed their communications, postings, and other activities to individuals in the same location." *Vizant Techs, LLC. v. Whitechurch*, 97 F. Supp. 3d. 618, 634 (E.D. Pa. 2015). In *Vizant*, the plaintiff technology company brought suit against a former employee for, among other things, defamation. In finding that the court had jurisdiction under the *Calder* test, the court noted that the employee was aware of the business's location and directed her defamatory comments at individuals who were within the forum state. *See id*. The court therefore concluded that the defendant "knew that the plaintiff[s] would suffer the brunt of the harm caused by the tortious conduct in Pennsylvania." *Id*.

Here, Smith had previously contracted with Shift4 and, in light of the fact that the parties' ISO Agreement references the location of Shift4's office in Allentown, he knew that Shift4 was headquartered in Pennsylvania. *See* Agreement 1. Thus, when Smith began to create duplicate advertisements and post those advertisements on Pennsylvania-specific websites, he "knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in Pennsylvania." *Id*. Further, when Smith caused robo-calls to tie up the phone lines at Shift4's Allentown headquarters, he knew that the brunt of the harm would be felt there. Similarly, when Smith caused "ghost" robo-calls to be directed at Shift4's ISOs, which looked as if Shift4 was calling and prompted the ISOs to call Shift4, he did so knowing that the harm would be felt in Pennsylvania.

### 3. Smith's conduct was expressly aimed at Pennsylvania.

The third factor of the *Calder* test requires that "the defendant must have manifested behavior intentionally targeted at and focused on the forum." *Gov't Emples. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153 (E.D Pa. 2017) (quoting *IMO Indus. v. Kiekert AG*, 155 F.3d 254 (3d Cir. 1998)) (internal quotations omitted). As discussed above, Smith placed duplicate advertisements on Pennsylvania-specific websites, directed robo-calls to Allentown, and published a defamatory website which he advertised on a Pennsylvania-specific website. These actions appear to be intentionally targeted at and focused on Pennsylvania, as evidenced further by Smith's efforts to lure Shift4 ISO's away from Shift4.

Consequently, even if the traditional test were not satisfied, personal jurisdiction over Smith is appropriate under the *Calder* effects test.

### C. The arbitration clause agreed upon by the parties encompasses all claims brought in this suit.

Where there is a valid agreement to arbitrate, as the parties concede exists here, the court may compel arbitration if the dispute falls within the scope of that valid agreement. *See Monfared v. St. Luke's Univ. Health Network*, 767 F. App'x 377, 379 (3d Cir. 2019). "In determining whether the particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 524 (3d Cir. 2009) (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986)). "Doubts should be resolved in favor of coverage." *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 (1960).

Here, the valid arbitration agreement is found in § 10.13, titled "Dispute Resolution," of the ISO Agreement. *See* Agreement 11. Section 10.13 states, in relevant part, "[a]ny dispute or claim arising out of, or in connection with this Agreement will be settled by final and binding arbitration . . . ." *See id.*

In the next four sections of the Opinion, the Court connects each of Shift4's claims to at least one provision in the ISO Agreement to show that all claims "arise out of, or in connection with" the ISO Agreement and therefore fall within the scope of the arbitration agreement in § 10.13. This discussion should not be construed as limiting the connection of the claims to only certain portions of the ISO Agreement, as many of them relate to multiple sections of the ISO Agreement. What is important is that each claim falls within the scope of the arbitration agreement. *See Century Indem. Co.*, 584 F.3d at 523 (holding that before compelling a party to arbitrate, the court must determine that the dispute "falls within the scope" of the agreement to arbitrate).

### 1. Shift4's claims relating to Smith/Alliance's use of trademarks are covered by, *inter alia*, §§ 3.2 and 8.2 of the Agreement.

Section 3.2 of the Agreement provides that "ISO will cease using HARBORTOUCH'S marking and solicitation materials upon termination of this Agreement or upon written notice from HARBORTOUCH at any time." *See* Agreement 4. Section 8.2 of the Agreement states, in relevant part, that "[n]either party will use the other's name in any promotional or marketing materials nor will it promote the others program in any way, without the other party's consent." *See id*. at 9.

Counts I through V, and XII of the Complaint arise, in various ways, from Smith/Alliance's allegedly unlawful use of Shift4's trademarks and service marks. *See* Compl. ¶¶ 90, 94, 101, 114, 125, 152, 171. Shift4 alleges that Alliance and Smith misappropriated the

Harbortouch Mark "with full knowledge of Shift4's prior use and registration of, and rights in and to, the HARBORTOUCH Mark." Such knowledge is explicitly outlined in the Agreement at §§ 3.2 and 8.2, entitled "Marketing Materials" and "HARBORTOUCH/ISO Trademarks," respectively. Thus, because resolution of these claims relates to an agreed-upon provision of the ISO Agreement, the claims arise out of or are in connection with said Agreement and are therefore subject to the agreement to arbitrate. *See Turck*, 156 N.J. at 486.

2. **Shift4's claims relating to false statements and misrepresentations made by Smith/Alliance are covered by, *inter alia*, § 7.3(B) of the Agreement.**

Section 7.3(B) of the Agreement provides that if "[a]ny representation or warranty made by ISO or any of its Affiliated Sales Personnel, employees, officers, or directors proves to be false or misleading in any material respect as of the date made, or becomes false or misleading at any time, including representations regarding the referral of a prospective Merchant" that shall constitute an Event of Default. *See* Agreement 7.

Counts VI, VII, and XI relate to allegedly false statements made by Alliance and Smith. *See* Compl. ¶¶ 128, 136, 165-66. Shift4 alleges that Alliance and Smith knowingly made "false statements of fact" and "false and defamatory statements." *See* Compl. ¶¶ 18, 136, 165-66. As these acts are expressly prohibited by the ISO Agreement, the claims arise out of, or are in connection with, the ISO Agreement and fall within the scope of the agreement to arbitrate.

3. **Shift4's claims relating to Smith/Alliance's interference and competition with its business are connected with, *inter alia*, § 7.3(D) of the Agreement.**

Section 7.3(D) provides that Alliance is in default if it "engages in activities which in the reasonable discretion of HARBORTOUCH may impose financial risk to HARBORTOUCH . . . or which result in undue economic hardship and/or damage to the good will of HARBORTOUCH." *See* Agreement 8.

Counts IX and X, asserting tortious interference with prospective business relationships and unfair competition, are supported by all of the alleged misconduct, including the duplicative advertisements and robo-calls, which Smith engaged in to lure Shift4 ISO's to Alliance. This type of prohibited conduct was clearly contemplated by the parties in § 7.3(D); thus, the claims arise out of, or are in connection with, the ISO Agreement and are subject to arbitration.

    **4.    Shift4's remaining count is covered by, *inter alia*, § 6.1(C) of the Agreement.**

Section 6.1(C) of the contract provides that "ISO represents and warrants to HARBORTOUCH that: . . . ISO will comply with the terms of this Agreement, with the Rules, and with all applicable state and federal laws and regulations." Such broad language indicates the parties' intent to have a wide range of claims governed by the Agreement.

Count VIII asserts tortious interference with contract pursuant to the common law of Pennsylvania. *See* Compl. ¶ 149. The Count is dependent on the existence of a contract and alleges violations of federal or state law, which is prohibited by the broad language of § 6.1(C). This claim therefore falls within the scope of the agreement to arbitrate.

Having determined that all claims arise out of, or are in connection with, the ISO Agreement and fall within the scope of the agreement to arbitrate, the Motion to Compel Arbitration is granted. Shift4's claims against Alliance and Smith[6] must be settled by final and binding arbitration.

---

[6]     A party, despite being a non-signatory to an arbitration agreement, may be equitably bound to arbitrate "under traditional principles of contract and agency law." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014). Courts must expressly consider "whether relevant state contract law recognizes [the particular principle] as a ground for enforcing contracts." *Id*. Further, various circuit courts have found that "it matters whether the party resisting arbitration is a signatory or not." *Merrill Lynch Investment Mngrs. v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003); *see also DJ Joint Venture 1 v. Weyand*, 649 F.3d 310, 316 (5th Cir. 2011). Under New Jersey law, "non-signatories to a contract may compel arbitration or be subject to arbitration if the nonparty is an agent or a party or a third party beneficiary to the contract."

## V. CONCLUSION

Due to Smith's numerous contacts with the state of Pennsylvania, as well as his intentional torts directed at Pennsylvania, this Court has personal jurisdiction over him. Smith's motion to dismiss for lack of personal jurisdiction is denied.

However, all of the claims brought by Shift4 arise out of, or in connection with, the ISO Agreement entered between Shift4 and Alliance and are subject to the valid arbitration agreement contained therein. Although Smith, individually, is a non-signatory to the ISO Agreement, he can compel arbitration under traditional agency theories because he signed the ISO Agreement on behalf of Alliance and, also, it was his allegedly unlawful conduct on behalf of Alliance that led to Shift4's claims. Defendants' motion to compel arbitration as it relates to both Alliance and Smith is therefore granted.

A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

*Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A.,* 333 N.J. Super. 291, 308 (App. Div. 2000), *rev'd on other grounds*, 168 N.J. 124. *See also Victory Entm't, Inc. v. Schibell*, 2018 No. A-3388-16T2, N.J. Super. Unpub. LEXIS 1467, *26 (App. Div. June 21, 2018); *Bruno v. Mark MaGrann Associates*, 388 N.J. Super. 539 (App. Div. 2006) (granting the defendant subcontractor's motion to compel arbitration although the plaintiffs and subcontractors had no direct contractual relationship with the subcontractors); *Alfano v. BDO Seidman, LLP.,* 393 N.J. Super. 560 (App. Div. 2007) (compelling arbitration between the plaintiff and the defendant because an agency relationship existed between defendant and the signatory).

Smith is the CEO of Alliance. *See* Compl. ¶ 7. Further, Smith signed the contract for Alliance as a "member" of the corporation. *See* Agreement 11. Smith, although not a signatory in his individual capacity, was acting as an agent of Alliance when he entered into the ISO Agreement with Shift4. Therefore, as an agent of Alliance, Smith can compel or be compelled to arbitrate any and all disputes which arise under the Agreement.